SEE, Justice.
Baptist Medical Center Montclair appeals from the trial court’s grant of a new trial following the return of a jury verdict in its favor. We affirm.

Facts

Dr. Scott Pennington admitted Thelbert Whitfield to Baptist Medical Center Mont-clair (“BMC”); Thelbert was suffering from gallstones and jaundice. Dr. Pennington is BMC’s chairman of general surgery.
On January 15, 2001, Dr. Pennington removed Thelbert’s gallbladder. Thelbert was discharged following the procedure, but he experienced problems and was re-hospitalized on January 21, 2001. On January 26, 2001, Dr. Pennington discovered that Thelbert had a leak in his gastrointestinal tract. Upon investigation, Dr. Pennington discovered that Thelbert’s bile duct was leaking; Dr. Pennington drained and repaired the leak. On January 29, 2001, Thelbert appeared to have developed an “upper gastrointestinal bleed.” Dr. Pennington gave Thelbert an infusion of blood and placed him in BMC’s surgical-intensive-care unit. Dr. Leonard Ou-Tim, a gastroenterologist at BMC, performed an endoscopy on Thelbert but was unable to locate the source of the bleed.
Julie Davis, a registered nurse, was Thelbert’s primary nurse on January 29, 2001, having begun her shift at 7:00 p.m. At approximately 7:30 p.m., Thelbert experienced a bloody bowel movement while he was lying on his bed. Davis reported the bloody bowel movement to the surgeon on call who, in response, instructed her to infuse Thelbert with two units of blood. At approximately 10:50 p.m., around the time the first unit of blood was fully transfused, Davis evaluated Thelbert and found his condition to be stable. Davis left the room to chart her assessment and order a second unit of blood for Thelbert. Soon after Davis left Thelbert’s room, the monitor alarm in Thelbert’s room was activated: Davis returned immediately to find that Thelbert had gotten out of his bed unassisted, had pulled out his intravenous tubes, and was sitting on a trash can while experiencing a bloody bowel movement. Davis and another nurse assisted Thelbert back into his bed. As they got him to his bed, Thelbert became unresponsive. Davis called for assistance, and the responding team attempted to resuscitate Thelbert. The resuscitation efforts were unsuccessful; Thelbert died shortly thereafter.
Dr. Kim Parker performed the autopsy on Thelbert. During the autopsy, the source of his gastrointestinal bleed was identified for the first time. Dr. Parker determined that Thelbert suffered from a Dieulafoy’s malformation, also known as a Dieulafoy’s lesion — a condition in which a lesion in an artery of the gastrointestinal tract causes gastrointestinal bleeding. Dr. Parker concluded from the autopsy that Thelbert had died from a massive gastrointestinal bleed. Dr. Pennington conferred with Dr. Parker shortly after the autopsy was completed and agreed with Dr. Parker’s findings. On February 5, 2001, Dr. Pennington signed Thelbert’s death certificate, noting “GI hemorrhage due to (or as a consequence of) Dieulafoy’s lesion duodenum” as his cause of death.
On August 30, 2002, Barbara Whitfield, Thelbert’s wife, as the administratrix and personal representative of Thelbert’s estate,- sued BMC, Montclair Surgical Associates, P.C. (Dr. Pennington’s practice group), and Birmingham Gastroenterology Associates, P.C., asserting claims of negligence relating to Thelbert’s death. On March 7, 2005, the day before trial, Whitfield voluntarily dismissed Montclair Surgical Associates, P.C., and Birmingham Gastroenterology Associates, P.C., from *1124 the action, leaving BMC as the only defendant.
In his opening statement, counsel for BMC implied that Whitfield had agreed to dismiss the charges against Montclair Surgical Associates on the condition that Dr. Pennington change his testimony so that it would be damaging to BMC. BMC’s counsel also suggested that Whitfield made the deal because it was easier for the jury to return a large verdict against a corporation like BMC rather than a group of doctors. BMC’s counsel stated:
“March 7th, 2005 — yesterday—the deal was consummated. [Whitfield] dismissed it. Why would [Whitfield] do that? Why would [Whitfield] do that? Because if [Whitfield] could have some testimony against the nurse, because we’re suing a hospital — bricks and mortar. It’s easier for you twelve people— thirteen people, I’m sorry — to bring a verdict back against bricks and mortar.”
Whitfield’s attorney objected to the statement and the trial judge sustained his objection. No curative instruction was requested or given.
The trial court heard from a number of witnesses; however, only Dr. Pennington’s testimony is relevant to this appeal. Dr. Pennington testified at trial as a witness for Whitfield. During direct examination, Whitfield’s counsel instructed Dr. Pennington to read portions of the transcript of his deposition taken on April 28, 2004. In his deposition, Dr. Pennington opined that Thelbert’s death was caused by his getting out of bed unassisted, resulting in a drop in blood pressure and heart rate, which in turn caused a cardiac arrest or arrhythmia from which he could not be resuscitated. At trial, Dr. Pennington testified to the same cause of death. Dr. Pennington also stated at trial that he stood by the theory he had advanced in his deposition as to Thelbert’s cause of death. In response to BMC’s suggestion during the trial that his opinion as to Thelbert’s cause of death changed after he executed Thelbert’s death certificate, Dr. Pennington explained that his opinion of Thelbert’s cause of death had not changed from the time he executed Whitfield’s death certificate to the time of his deposition and then his trial testimony. When Whitfield’s counsel asked him to explain why he wrote “GI hemorrhage due to (or as a consequence of) Dieulafoy’s lesion duodenum” as the cause of death on Thelbert’s death certificate rather than cardiac arrest, Pennington stated:
“I think it’s a problem of semantics. In other words, it’s a problem of language. What I meant in the death certificate is that indeed the underlying cause of Mr. Whitfield’s death was the GI bleed, in the sense that we’ve talked about. The GI bleed set him up for this scenario, a scenario that unfortunately led to his death. The GI bleed created the low blood pressure, relative hypovolemia, despite his being transfused and despite the fact he was stable in a recumbent position. When he — the best that we can put the picture together, when he got up and sat on the trash can, his blood pressure may have become low, he may have underperfused his coronary arteries and may have had a heart attack. We don’t know exactly what happened, but that’s the best explanation I have. Now, on the coroner’s report that I have to fill out, what I put is the underlying cause of his death. The most proximate cause of his death — and we can quibble about what ‘proximate’ or ‘immediate’ means — would be the GI hemorrhage, because that’s what led to everything else. It’s like a cascade of events. And the cause of GI hemorrhage, which we only discovered at pathology after autopsy, was the Dieula- *1125 foy’s lesion, the bleeding lesion in the duodenum.”
During direct examination of Dr. Pennington, Whitfield’s counsel also addressed the remarks by BMC’s counsel in his opening statement concerning a deal between Dr. Pennington and Whitfield:
“[Whitfield’s counsel]: There has been a direct statement made to these ladies and gentlemen of the jury that we made a deal, we made a deal to either get you to give this testimony or to come to court today. So, sir, let me just ask you straight up: Have we made a deal?
“[Dr. Pennington]: No, sir.
“[Whitfield’s counsel]: Has anybody promised you anything to give the deposition, sworn testimony you gave in April 2004?
“[Dr. Pennington]: No, sir.
“[Whitfield’s counsel]: Has anybody promised you anything to come to court and give the testimony you gave today?
“[Dr. Pennington]: No, sir.”
In closing arguments, BMC’s counsel again stated that Whitfield had made a deal with Dr. Pennington pursuant to which the charges against his practice group would be dismissed in exchange for his testimony against BMC because, counsel stated, the jury was more likely to return a large verdict against a corporation like BMC rather than a group of doctors. BMC’s counsel made the following statement during his closing argument:
“The deal was made, the deal was done. And the deal was consummated March 7, 2005. You come here, and you just follow that testimony so we can hang this nurse out to dry. And then you’ll be dismissed from this case. Do you know why? Let me tell you why. Because it’s easier for you folks to bring a verdict back — $7.5 million — -against a hospital, a corporation, than it is a doctor. That is why it was done. That, to me, is insulting to you. It’s insulting to you, that you would be swayed by that. But that was the deal that was cut in this case. It may be the seedy side of what goes on, but that’s what happened.”
Whitfield’s counsel did not object.
The jury returned a verdict in favor of BMC, and the trial court entered a judgment on the verdict. Whitfield moved for a new trial. After a hearing, the trial court granted Whitfield’s motion for a new trial. The trial court stated in its order granting a new trial:
“This Court finds that those arguments presented in [BMC’s] closing argument were improper, prejudicial, inflammatory, and could not reasonably be cured by instruction of this Court and that as a result of their cumulative effect, the verdict returned by the jury was a product of passion, prejudice, bias and sympathy in favor of [BMC] and against [Whitfield].”
The trial court explained:
“By arguing that some sort of ‘deal’ had been ‘cut’ between counsel for [Whitfield] and one of the previously named Defendants herein, together with the argument that ‘It may be the seedy side of what goes on,’ taken in toto with all the facts and circumstances presented at trial, [Whitfield] was prejudiced beyond any curative instruction by this Court.”
BMC appeals the trial court’s grant of a new trial.

Standard of Review

The trial court granted Whitfield’s motion for a new trial on the basis that the closing argument by BMC’s counsel contained improper, prejudicial, and inflammatory arguments. When the court grants a motion for a new trial on grounds other than a finding that the verdict is *1126 against the great weight or preponderance of the evidence, this Court’s review is limited.
“ ‘It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.’ ”
Curtis v. Faulkner Univ., 575 So.2d 1064, 1065-66 (Ala.1991) (quoting Kane v. Edward J. Woerner & Sons, Inc., 543 So.2d 693, 694 (Ala.1989), quoting in turn Hill v. Sherwood, 488 So.2d 1357, 1359 (1986)).

Analysis

This Court will reverse the trial court’s grant of a new trial on the basis of improper closing argument by counsel only if it is shown that, in so doing, the trial court abused BMC’s legal rights and its decision was plainly and palpably wrong. Curtis, 575 So.2d at 1065-66. BMC does not allege in its brief to this Court that the trial court encroached on any of its legal rights in granting Whitfield’s motion for a new trial. BMC argues that the trial court’s decision was plainly and palpably wrong. However, under our standard of review, we cannot agree. Therefore, we must affirm the trial court’s order granting Whitfield a new trial.
BMC’s counsel in this case made statements regarding an alleged deal between Whitfield and Dr. Pennington during both his opening statement and his closing argument. The trial court based its award of a new trial on statements by BMC’s counsel in closing argument, noting that the closing argument, “taken in toto with all the facts and circumstances presented at trial” resulted in prejudice to the plaintiff that was beyond any curative instruction. Thus, we will first address the improper argument in the opening statement.
BMC’s counsel stated in his opening statement that Whitfield had made a deal with Dr. Pennington pursuant to which Dr. Pennington’s practice group would be dismissed from the case in return for his testimony against BMC. Whitfield’s attorney objected to that statement, and the trial court sustained his objection. When a party objects to improper argument and the trial court sustains the objection, in order to obtain a new trial on the basis of the improper argument, it is necessary that the party request a curative instruction from the trial court. See Southern Life & Health Ins. Co. v. Smith, 518 So.2d 77, 81 (Ala.1987), Walker v. Asbestos Abatement Servs., Inc., 639 So.2d 513, 514 (Ala.1994) (citing Calvert & Marsh Coal Co. v. Pass, 393 So.2d 955 (Ala.1981)). In this case, Whitfield’s attor ney did not request a curative instruction after the trial court sustained his objection. Generally, the objecting party’s failure to seek a curative instruction “indicates satisfaction with the ruling; that party cannot later complain of the trial court’s failure to do what it was not asked to do.” Walker, 639 So.2d at 515. Nevertheless, this Court has also noted that “[b]ecause there was no admonition from the trial court, the influence of this improper argument was not eradicated from the minds of the jury.” Otis Elevator Co. v. Stallworth, 474 So.2d 82, 84 (Ala.1985). Therefore, even though the trial court sustained Whitfield’s objection and no corrective action was requested or taken, the trial court could have considered the opening statement by BMC’s counsel in evaluating the cumulative effect of counsel’s remarks and whether, in the context of the trial, those remarks were grossly improper and highly prejudicial.
*1127 The trial court granted Whitfield’s motion for a new trial on the basis of the reference by BMC’s counsel in his closing argument to an' alleged deal between Dr. Pennington and BMC. Generally, unless there is an objection and it is overruled, “improper argument of counsel is not ground for new trial.” Southern Life & Health, 518 So.2d at 81 (citing Alabama Power Co. v. Henderson, 342 So.2d 323, 327 (Ala.1976), and Hill v. Sherwood, 488 So.2d, 1357, 1359 (Ala.1986)). However, there is an exception to the requirement that an objection must have been overruled in order for improper argument of counsel to serve as the basis for a new trial. A new trial may be granted based on improper argument of counsel, even where no objection to the statement was made, “where it can be shown that counsel’s remarks were so grossly improper and highly prejudicial as to be beyond corrective action by the trial court.” Southern Life & Health, 518 So.2d at 81. Thus, where the party seeking a new trial does not object to allegedly improper argument by opposing counsel, opposing counsel’s statements can still serve as the basis for a new trial if, in the trial court’s opinion, those statements are “grossly improper and highly prejudicial.” Southern Life & Health, 518 So.2d at 81. In this case, Whitfield did not object to any part of the closing argument by BMC’s counsel. Thus, counsel’s remarks during closing argument can form the basis for a new trial only if the trial court properly concluded that the remarks were grossly improper and highly prejudicial. We proceed to consider whether the trial court plainly and palpably erred in reaching that conclusion.
Whether argument of counsel is grossly improper or highly prejudicial is a fact-specific inquiry. This Court has explained:
“There is no hard and fast rule as to when a remark made by counsel in closing argument is deemed to be so grossly improper and highly prejudicial as to be ineradicable from the minds of the jurors, notwithstanding a timely admonition from the trial judge. Each case must be decided in light of the peculiar facts and circumstances involved, and the atmosphere created, in the trial of each particular case.”
Hill, 488 So.2d at 1359. Moreover, although it is not without bounds, “the trial court has great latitude in ruling on the propriety of an attorney’s ... closing argument.” Hayden v. Elam, 739 So.2d 1088, 1093 (Ala.1999) (citing Prescott v. Martin, 331 So.2d 240 (Ala.1976)).[1] The facts and circumstances in this case indicate that, under the applicable standard of review, the trial court’s grant of Whitfield’s motion for a new trial does not warrant a reversal because BMC has failed to show that the trial court’s decision constituted plain and palpable error. Curtis, 575 So.2d at 1065-66.
The remarks by BMC’s counsel during closing argument indicated that Dr. Pen *1128 nington and Whitfield had made a “deal”— Whitfield would drop her claims against Dr. Pennington’s practice group if Dr. Pennington would provide negative testimony against BMC.[2] BMC’s counsel further stated that Whitfield dismissed Dr. Pennington’s practice group as a defendant because Whitfield wanted to concentrate her efforts on her claims against BMC, because “it’s easier for [the jury] to bring a verdict back — $7.5 million — against a hospital, a corporation, than it is a doctor.” BMC’s counsel argued that Whitfield wanted to focus on recovering from BMC, a corporation, which had more money than Dr. Pennington’s practice group.[3]
This Court has found similar arguments pertaining to the corporate nature of an entity and its resources to be grossly improper and highly prejudicial. In Otis Elevator, this Court found the following argument by counsel for the plaintiff to be an improper comment on the wealth of the defendant: “ ‘The same company that can afford to hire [an expert witness from New York] to come in and testify for Otis and against a hundred people who have been hurt on Otis elevators in the last four years, that’s the company that’s going to have to pay this judgment.’ ” 474 So.2d at 83. This Court held the following remark in Allison v. Acton-Etheridge Coal Co., 289 Ala. 443, 446, 268 So.2d 725, 727 (1972), to be highly prejudicial: “ ‘It’s a great thing, folks, to be a very wealthy man and to be able to go out here and hire two law firms with four lawyers.’ ” Plaintiffs counsel in Southern Life & Health stated the following with regard to the defendant corporation: “ ‘A corporation ... is a legal entity ..., but it’s not a human being. It has no conscience. The only way you can punish a corporation is through monetary damages.’” 518 So.2d at 80. This Court noted that plaintiffs counsel’s argument “was improper, highly prejudicial, and irrelevant to the issues.” Southern Life & Health, 518 So.2d at 81.[4]
This Court also affirmed the trial court’s grant of a motion for a new trial grounded on improper argument in a negligence action against multiple defendants, some of whom were individuals and one of which was a car dealership. Taylor v. Brownell-O’Hear Pontiac Co., 265 Ala. 468, 91 So.2d 828 (1957). Commenting on the dismissal of Ritchie, one of the individual defendants, plaintiffs counsel stated in his closing argument that ‘“[w]e have also dismissed as to Mr. Ritchie. We don’t want to penalize Mr. Ritchie. We are after somebody that can pay,’ ” referring to the car dealership. Taylor, 265 Ala. at 469, 91 So.2d at 828. The Court concluded that such remarks “were ... well calculated to *1129 influence the amount of the jury’s verdict.” Taylor, 265 Ala. at 469, 91 So.2d at 829. Similarly, in American Ry. Express Co. v. Reid, 216 Ala. 479, 113 So. 507 (1927), this Court found the following to constitute improper argument by counsel:
“‘“We are asking simply for justice which this boy is entitled to. And we are going to insist that he is entitled to some good round sum. It doesn’t make any difference to the American Express Company, this defendant. What difference does it make to them what your verdict in this case is?” ’ ”
216 Ala. at 484,113 So. at 510.
In the case before us, by alluding to the relative financial resources of BMC and the fact that BMC is a corporation, BMC’s counsel essentially attributed to Whitfield improper arguments and made statements similarly calculated to prejudice the jury against Whitfield. Thus, we cannot conclude that the trial court’s finding that the arguments of BMC’s counsel were grossly improper and highly prejudicial is plainly and palpably wrong.
In addition, the arguments by BMC’s counsel were not based on a reasonable inference from the evidence presented at trial. This Court has noted that “counsel may comment on all proper inferences to be drawn from the evidence and may draw conclusions by way of argument based on the evidence.” Salser v. K.I.W.I., S.A., 591 So.2d 454, 457 (Ala.1991). BMC argues that its remarks concerning the change in Dr. Pennington’s opinion as to Thelbert’s cause of death were similar to the statements made by defense counsel in Seaboard Coast Line R.R. v. Moore, 479 So.2d 1131 (Ala.1985). In Seaboard, this Court found that defense counsel’s implication in closing argument that the plaintiff had persuaded a witness to change his testimony did not constitute error because there was testimony that the witness’s trial testimony was inconsistent with the version of the events he had presented to the defendant before trial. Seaboard, 479 So.2d at 1136. The facts in this case are distinguishable from those in Seaboard, however, because Dr. Pennington’s deposition testimony and subsequent trial testimony were consistent; thus, the rationale of Seaboard does not apply.
The argument by BMC’s counsel that Dr. Pennington had entered into some sort of a “deal” with Whitfield pursuant to which he would provide testimony against BMC in exchange for his practice group’s being dismissed from the action is not a proper inference that can be drawn from the evidence. BMC’s counsel stated in closing arguments that Whitfield’s “deal” with Dr. Pennington to change his testimony so that it would be damaging to BMC was “consummated” on March 7, 2005, the day before trial was set to begin. However, evidence presented by Whitfield at trial showed that Dr. Pennington’s trial testimony as to the cause of Whitfield’s death did not change and that his trial testimony was consistent with the statements he had made in his deposition in April 2004, when his group was still a defendant in the litigation. BMC does not provide evidence to the contrary.[5] Dr. Pennington testified at trial that Thelbert’s “getting up out of bed, pulling out of his lines, having his blood pressure drop, the heart rate drop, getting in the trash can, and having this bowel movement — those probably led to the arrest, the cardiac arrest at that time.” After providing that testimony, Dr. Pen *1130 nington read the following exchange directly from the transcript of his deposition:
“[Whitfield’s counsel]: Dr. Pennington, looking at the totality of the circumstances, isn’t it probable that getting up out of bed, pulling the NG tube out, pulling the I.V. line out, that those were probably related to the [cardiac] arrest?
“[Dr. Pennington]: Yes.
“[Whitfield’s counsel]: Okay. Why would that be true?
“[Dr. Pennington]: Well, because of the relative — I presume, the relative hy-povolemia, the underlying coronary artery disease, assuming the upright position, having a bowel movement, all of those could have combined to lower the perfusion, limit the perfusion of his heart, and caused a fatal arrhythmia or heart attack.”
Dr. Pennington’s testimony at trial as to the cause of Thelbert’s death was consistent with his deposition testimony. The evidence does not support the inference that Whitfield’s dismissal of Dr. Pennington’s group from the action on the eve of trial was motivated by a desire to secure damaging testimony against BMC from Dr. Pennington — Whitfield did not need Dr. Pennington’s trial testimony because she had already obtained damaging statements against BMC from Dr. Pennington during his deposition, and she could have introduced his deposition testimony into evidence if Dr. Pennington had testified differently at trial.
In reviewing whether BMC’s counsel’s statements constitute improper arguments, we accord a presumption of correctness to the trial court’s findings. Salser, 591 So.2d at 457. We cannot conclude that the trial court was plainly and palpably wrong in granting Whitfield’s motion for a new trial because the statements by BMC’s counsel regarding the corporate nature of BMC constitutes improper argument and his reference to Whitfield’s alleged “deal” to obtain Dr. Pennington’s testimony against BMC was not a reasonable inference based on the evidence presented at trial.
The standard of review applicable to the trial court’s grant of a motion for a new trial on the basis of improper argument by counsel requires us to affirm the trial court’s ruling “ ‘unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.’ ” Curtis, 575 So.2d at 1066 (quoting Kane, 543 So.2d at 694). BMC does not demonstrate that any of its legal rights were abused, and the record does not support a finding that the trial court was plainly and palpably wrong in finding defense counsel’s remarks in closing arguments improper and in granting Whitfield’s motion for a new trial on that ground. As we have stated before, “since the trial court is present at the time when the argument is made, the trial court has great latitude in ruling on the propriety of counsel’s arguments.... In particular, in passing on the question of ineradicable bias much should be left to the enlightened judgment of the trial court, with the usual presumptions in favor of the ruling made to that end.” Calvert & Marsh Coal Co., 393 So.2d at 959 (citing Alabama Power Co. v. Bowers, 252 Ala. 49, 39 So.2d 402 (1949), and Pacific Mut. Life Ins. Co. v. Green, 232 Ala. 50, 166 So. 696 (1936)). In light of the presumption of correctness accorded to the trial court’s ruling on a motion for a new trial and based on the facts and circumstances in this case,- we cannot find that the trial court committed plain and palpable error.

Conclusion

BMC does not demonstrate that the trial court’s grant of Whitfield’s motion for a new trial encroached upon any of BMC’s *1131 legal rights and that its ruling is plainly and palpably in error. Therefore, the trial court’s judgment is affirmed.
AFFIRMED.
NABERS, C.J., and HARWOOD, STUART, and BOLIN, JJ., concur.

. We note that during direct examination of Dr. Pennington, Whitfield’s attorney voluntarily raised the issue of the purported "deal,” asking Dr. Pennington whether BMC’s allegations were true and whether he had received anything in return for his testimony at trial, to which Dr. Pennington responded that the allegations were not true. Whitfield’s attorney made that' statement in response to the opening statement by BMC’s counsel and in anticipation of cross-examination. The fact that Whitfield’s attorney raised the issue of the deal during direct examination does not prohibit the trial court from evaluating whether the remarks by BMC’s counsel were grossly improper and highly prejudicial “in light of the peculiar facts and circumstances involved, and the atmosphere created, in the trial of each particular case.” Hill, 488 So.2d at 1359.

. The closing argument by BMC’s counsel misstates the nature of Whitfield's claims against Dr. Pennington by implying that Whitfield had made a deal to dismiss Dr. Pennington as an individual defendant from the case. Dr. Pennington was never named an individual defendant in this case; Whitfield sued Dr. Pennington's practice group, not Dr. Pennington individually.

. We note that Dr. Pennington’s practice group, Montclair Surgical Associates, P.C., is also a corporation. BMC’s counsel misstated that Whitfield’s claims against Dr. Pennington were brought against him in his individual capacity, when, in fact, her claims were brought against Montclair Surgical Associates, P.C.

.The defendant's objection to the argument was sustained, but its motion for a new trial, grounded in part on improper argument, was denied. This Court found that the trial court's denial of the motion for a new trial was not unjust and plainly erroneous because the trial court had sustained the defendant's objection to plaintiff's counsel's improper argument and offered to give the jury curative instructions. 518 So.2d at 81-82. However, it noted that an adverse ruling on the defendant's objection "would have required us to reverse and remand.” 518 So.2d at 81.

. BMC’s arguments of inconsistency focus on the alleged change in Dr. Pennington's opinion as to Thelbert’s cause of death from the time he signed Thelbert’s death certificate to the time he was deposed. BMC does not argue that Dr. Pennington’s deposition testimony is inconsistent with his trial testimony.