MAIN, Justice.[1]
Mary Leila Beasley Schaeffer and the estate of Emma Glass Beasley (hereinafter *982 collectively referred to as “the Beasley branch”) appeal from a judgment entered on a jury verdict, awarding compensatory damages and punitive damages on mismanagement-of-trust and conversion claims in an action by William M. Poellnitz, as administrator of the estate of Edwin Glass Young, deceased, Adele Young Som-mers, and Willard P. Young (hereinafter collectively referred to as “the Young branch”). We affirm in part and we reverse in part and render a judgment for the Beasley branch on certain of the Young branch’s claims.

I. Facts and Procedural History

This case involves the management of a family trust, the Westwood Management Trust (“the Trust”); the disposition of personal property after the death of a family member, Edwin Glass Young (“Eddie”); and claims of moneys owed between family members. The corpus of the Trust consists of family farmland, called Westwood (“Westwood”), located in Uniontown, Perry County, comprising 541 acres, and an antebellum house situated on Westwood. Two sisters, Emma Glass Beasley (“Emma”) and Lyle Glass Young (“Lyle”),[2] inherited Westwood, including the house, as well as two adjoining properties called Shields, consisting of 329 acres (“the Shields property”), and Davidson, consisting of 598 acres (“the Davidson property”), from their parents, Julius Franklin Glass and Adele Davidson Ellis Glass, who died in 1964 and 1988, respectively. Emma had two daughters, Ellis Beasley Long (“Ellis”) and Mary Leila Beasley Schaeffer (“Mary”).[3] Lyle had three children, Eddie-, who died in 2005, Willard P. Young (“Billy”), and Adele Young Sommers (“Adele”).
Members of the Beasley branch and the Young branch have resided at Westwood sporadically throughout the years. In particular, in the 1940s, Emma, along with her two daughters, Ellis ■ and Mary, and Emma’s sister, Lyle, along with her children, Eddie, Billy, and Adele, lived at Westwood. In 1951, Emma, Ellis, and Mary moved to Houston, Texas, while various members of the Young branch continued to reside at Westwood.[4]
In August 1964, Billy left Westwood to enter college, and he never returned to live at Westwood. In the mid 1960s, Mary and Ellis returned to Westwood and managed the family farms, the primary product of which was cotton, and ran the cotton gin on the property while their mother, Emma, remained in Texas to care for her mother and her sister, Lyle, who both had moved to Texas to live with her. Eddie assisted his cousins, Mary and Ellis, in running the cotton gin in 1969 and 1970 before he married and moved to Louisiana. Adele moved from Westwood around 1970 and did not return.
Lyle, who had moved to Texas to live with Emma in 1968, developed substantial medical problems while there that prevented her from working. Emma cared for Lyle while she lived with her. Lyle’s children did not assist with their mother’s care.
Lyle’s children visited her infrequently while she was living in Texas with Emma. During the time Lyle lived in Texas — from 1968 until her death in 1996 — Eddie lived *983 in Louisiana until 1993, when he returned to Alabama; Billy lived in California, where he had resided since 1972; and Adele, after leaving Westwood around 1970, lived in Texas for a brief period, where she completed high school and some college, and subsequently moved to Florida.
In December 1995, Emma employed an attorney in Texas to draft the Trust. The primary purpose of the Trust was to protect, maintain, and provide for Emma and Lyle during their lifetimes. The Trust instrument provided that Emma’s and Lyle’s children held a beneficiary interest in the corpus of the Trust, contingent upon the death of both Emma and Lyle. Emma’s and Lyle’s children would receive distributions, following the deaths of both Emma and Lyle, only if there was sufficient net income each fiscal year to make proper distributions. Emma was named the trustee of the Trust. On December 21, 1995, Emma and Lyle executed the Trust instrument. That same day, Emma and Lyle deeded Westwood, including the house, to the Trust. Lyle died in June 1996. Lyle’s will provided that all of her assets were devised to her 3 children— Eddie, Billy, and Adele.
In May 1996, before Lyle’s death, Billy initiated a partition-of-land lawsuit in Mar-engo County concerning the Shields property and the Davidson property. In January 1998, the Beasley branch and the Young branch entered into a mediated settlement agreement. The Shields property and the Davidson property were reapportioned and both the Beasley branch and the Young branch received 433 acres of land. At that time, the Young branch agreed to reimburse the Beasley branch $28,000 incurred for the caretaking of their mother, Lyle, upon the sale of their portion of the land.
Eddie, who had returned to Uniontown from Louisiana around 1993, lived at the Westwood house for a short period in 1995 before moving to the cotton-gin office, where he remained until he died there on February 3, 2005. While Eddie was living in Uniontown from 1993 until his death in 2005, he did not pay rent but performed various tasks on and for Westwood. Eddie’s body was removed from the cotton-gin office on February 5, 2005. Because the cotton-gin office had been burglarized on several occasions, Mary locked the cotton-gin office after Eddie’s body was removed.
The day after Eddie’s body was removed, Mary, who had moved back into the Westwood house in 1999 with her mother, Emma, inventoried the items in the cotton-gin office and took them to Westwood. That same day, Mary made arrangements for Eddie’s funeral and paid the initial $3,000. Eddie’s funeral expenses totaled $8,966. Although Adele agreed to be responsible for the costs of Eddie’s funeral, Adele never paid any portion of those costs. Mary and Emma paid the remaining funeral expenses, and the funeral home assigned to Mary its claim against Eddie’s estate for those expenses.
In May 2005, Poellnitz informed Mary that he had been appointed administrator of Eddie’s estate, and he requested a time when he could take possession of Eddie’s personal items. Mary delivered the items to Poellnitz’s office. When Poellnitz filed the complaint in this matter, he claimed that several guns, numerous tools, furniture, china, sterling silver, antique fly-fishing rods, and a gas grill belonging to Eddie remained in Mary’s possession. The complaint alleged that the items had an approximate value of $25,000.
Mary responded in detail regarding the items Poellnitz claimed belonged to Eddie. Mary stated, in the alternative, that the *984 items were not at Westwood; that they had been paid for by, and belonged to, Westwood; or that the items had previously been stolen from the cotton-gin office. At trial, Mary testified that, after this action was filed in May 2005, she had been instructed by her attorney not to return any of the items still in her possession until the issues could be resolved in the litigation.
In addition to the items that Emma and Mary had removed from the cotton-gin office, Eddie had furniture at the West-wood house that had been left there by him. After Eddie died, according to Mary, Poellnitz agreed that the Beasley branch could purchase the furniture for an agreed-upon price of $1,000. Because Eddie’s estate owed the Beasley branch quite a bit of money, Mary agreed to give a $1,000 credit against the debt owed in exchange for the furniture.
On May 13, 2005, the Young branch sued Emma, individually and as trustee, and Mary, individually, alleging conversion of Eddie’s personal property and demanding an accounting of the Trust. The Beasley branch answered the complaint and denied the allegations. The Beasley branch filed a counterclaim seeking recovery on assorted debts totaling $79,395 allegedly owed by the Young branch to the Beasley branch and attaching various documents evidencing those debts. In its counterclaim, the Beasley branch also named Veronica Young, Billy’s wife, as a counterclaim defendant, alleging that certain sums were owed to the Beasley branch and the Trust by both Billy and Veronica.
The Young branch then amended its complaint, alleging, in addition to another claim not relevant to this appeal, mismanagement of the Trust by the trustee, Emma, and seeking a one-half interest in the furnishings and other family heirlooms in the Westwood house, and answered the counterclaim, generally denying the allegations and asserting affirmative defenses. The Young branch filed a second amended complaint, seeking, among other things, an award of compensatory and punitive damages under theories of conversion and mismanagement of the Trust. The Beasley branch filed a motion to dismiss, which was denied.
Ellis returned to Westwood in September 2008, while the litigation was pending. Emma, the trustee, died on June 12, 2010. Ellis was named personal representative of Emma’s estate.[5] Mary and Adele became cotrustees of the Trust pursuant to the Trust instrument.
The case was eventually tried before a jury from May 25 to June 2, 2011, on the Young branch’s mismanagement-of-trust and conversion claims, as well as their claims for an accounting and for an award of a one-half interest in the furnishings and other heirlooms in the Westwood house. The jury also considered the Beasley branch’s counterclaims against the Young branch for various money loaned to the Young branch. The jury jointly awarded the Young branch $63,915.18 against Emma’s estate and Mary on the claim alleging mismanagement of the Trust. The jury awarded the Young branch $3,645 on its claim of conversion of Eddie’s property. The jury jointly awarded the Young branch one-half of the furnishings and heirlooms in the Westwood house, which the jury valued at $172,000 in total. On the counterclaims the jury exonerated Adele and Eddie’s estate but awarded jointly to Emma’s estate and Mary $8,043.48 against Billy and an addi *985 tional $8,043.48 against his wife, Veronica.[6] The jury also returned a verdict in favor of the Young branch on then’ claims for punitive damages, awarding $200,000 to each of Eddie’s estate, Billy, and Adele and assessing those amounts collectively against the Beasley branch.
On June 5, 2011, the trial court removed Mary and Adele as cotrustees of the Trust and removed Poellnitz as the administrator of Eddie’s estate. On June 14, 2011, the trial court entered a judgment on the jury’s verdict. The Beasley branch filed postjudgment motions. On August 22, 2011, the trial court appointed William Mackey as both administrator of Eddie’s estate and trustee of the Trust.[7] On September 7, 2011, the Beasley branch filed motions for a judgment as a matter of law (“JML”), a new trial, or a remittitur, which the trial court denied. In its November 23, 2011, postjudgment order, however, the trial court amended the jury’s punitive-damages award to assess $100,000 on behalf of each of Eddie’s estate, Billy, and Adele against Emma’s estate, and $100,000 on behalf of each of Eddie’s estate, Billy, and Adele against Mary. The Beasley branch appealed.

II. Standards of Review

A. Motion for a JML

“When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmov-ant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala. 1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala. 2003).

B. Motion for a New Trial

“ ‘ “It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record *986 plainly and palpably shows the trial judge to be in error.” ’
“Curtis v. Faulkner Univ., 575 So.2d 1064, 1065-66 (Ala.1991) (quoting Kane v. Edward J. Woemer & Sons, Inc., 543 So.2d 693, 694 (Ala.1989), quoting in turn Hill v. Sherwood, 488 So.2d 1357, 1359 (1986)).”
Baptist Med. Ctr. Montclair v. Whitfield, 950 So.2d 1121, 1125-26 (Ala.2006).

C. Punitive Damages

This Court “review[s] the trial court’s award of punitive damages de novo, with no presumption of correctness.” Mack Trucks, Inc. v.. Witherspoon, 867 So.2d 307, 309 (Ala.2003) (citing Acceptance Ins. Co. v. Brown, 832 So.2d 1, 24 (Ala.2001)). See also § 6-11-23, Ala.Code 1975 (“No presumption of correctness shall apply as to the amount of punitive damages awarded by the trier of the fact.”).

III. Analysis

The Beasley branch essentially presents five issues on appeal. First, the Beasley branch argues that it is entitled to a JML on the mismanagement-of-trust claim. Second, the Beasley branch argues that it is entitled to a JML on the conversion claim. Third, as to the punitive damages, the Beasley branch argues that punitive damages were not warranted. Alternatively, the Beasley branch argues that the trial court improperly apportioned the punitive damages. Regardless, it says, the punitive damages are excessive and the award must be vacated or remitted. Fourth, the Beasley branch argues that it is entitled to a JML on the Young branch’s claim to a one-half ownership interest in the furnishings and heirlooms at West-wood or to a reduction of the value of those furnishings and heirlooms. Last, the Beasley branch argues that it was entitled to a JML on all of its counterclaims for moneys loaned to the Young branch. As part of its argument on its counterclaims, the Beasley branch complains that the trial court cannot undo the Marengo County judgment in the amount of $28,000. We consider these in turn.

A. Mismanagement of the Trust

Typically, a mismanagement-of-trust claim requires the beneficiaries to produce evidence “showing what [the trustee] should have done, how [the trustee] failed to do so, and how any such failure proximately caused damage to the trust and in what amount.” See Regions Bank v. Lowrey, 101 So.3d 210, 213-14 (Ala. 2012). However, in this case, the Trust instrument, which provides that it is governed by Texas law,[8] directed that “[t]he Trustee be saved harmless from any liability for any action which such Trustee may take, or for the failure of such Trustee to take any action, if done in good faith and without gross negligence.” Consequently, the Young branch had to prove gross negligence on the part of the trustee. Gross negligence was defined at trial as “the intentional failure to perform a manifested duty in reckless disregard of the consequences as affecting the life and property of another.” See, e.g., U-Haul Int'l Inc. v. Waldrip, 380 S.W.3d 118, 137-38 (Tex. 2012); Merchants’ Bank of Mobile v. Zadek, 203 Ala. 518, 520, 84 So. 715, 717 (1919).
Emma’s estate and Mary first argue that the trial court erred when it denied their motions for a JML because, they say, the Young branch failed to prove gross negligence. The Young branch had alleged that it did not receive substantial *987 distributions from the Trust or account-ings and that those failures represented gross negligence. The Young branch had also criticized trust-related payments shown in the Trust’s financial statements and had alleged that the trustee improperly commingled funds.
The evidence showed that Emma served as trustee until her death in June 2010. Mary served as the bookkeeper for the Trust at Emma’s direction. Mary subsequently served as cotrustee with Adele after Emma died and until she and Adele were removed as cotrustees by the trial court.
As to the mismanagement-of-trust claim against Mary, based on the record before us, we conclude that there is no evidence of mismanagement of the Trust by Mary for the limited'time she served as cotrustee with Adele. All the evidence at trial concerned the time Emma served as the trustee. Consequently, we conclude that, as a matter of law, the Young branch’s mismanagement-of-trust claim against Mary should not have been submitted to the jury. Mary, was entitled to a JML as to that claim. Therefore, we reverse the trial court’s judgment against Mary on the mismanagement-of-trust claim and render a judgment in her favor on that claim.
Next, we turn to the mismanagement-of-trust claim against Emma. First, regarding distributions from the Trust, the Trust instrument directed Emma to distribute income from Lyle’s share, after Lyle’s death in 1996, yearly to Eddie, Billy, and Adele in equal thirds. However, the Trust explicitly provided that the distributions depended upon whether there was any income remaining in that particular year after payment of trust-related expenses. The evidence failed to demonstrate that' there was any income left to distribute to the beneficiaries of the Trust after the expenses were paid. Instead, the evidence showed that Emma actually put substantial amounts of her own money into the Trust to keep Westwood operational. Accordingly, there was no evidence indicating that Emma acted with gross negligence in declining to make any distributions from the Trust to the Young branch.
Second, as to accountings, the evidence showed that yearly accounting statements showing income and expenses of the Trust were prepared every year and were sent to the Internal Revenue Service (“IRS”) with the yearly tax returns for the Trust. In addition, Eddie, Billy, and Adele were provided with annual statements from the Trust to use in preparing their personal tax returns. The evidence also indicated that the Young branch never requested additional accountings. We cannot conclude, on the record before us, that there was any evidence of gross negligence with regard to the yearly accountings that Emma provided the Young branch.
Third, regarding improper non-trust-related expenses, the Young branch again failed to provide evidence supporting its claim. The accounting records do not demonstrate that money from the Trust was spent for improper, non-trust-related purposes. Instead, Mary’s testimony indicated that she kept detailed records, and she explained every expense.
Similarly, as to the allegations of commingling, although Emma used one business account for both the Trust and her personal business activities, that same account was used before the Trust was established to manage both Emma’s personal property and the family properties. There was no evidence indicating that this practice in any way harmed the Trust or diminished the corpus of the Trust. Instead, the Trust funds were always accounted for separately and were traceable in the Trust *988 record books. Accordingly, there is no evidence indicating that Emma acted with gross negligence in continuing this longstanding family practice of using one account for various properties.
We conclude that the Young branch failed to present sufficient evidence showing that Emma mismanaged the Trust. Because the evidence does not support a finding of mismanagement of the Trust, the trial court erred in denying the motion for a JML filed by Emma’s estate as to the Young branch’s mismanagement-of-trust claim. Therefore, that claim should not have been submitted to the jury, and the trial court’s order denying Emma’s estate’s motion for a JML is due to be reversed. We reverse the trial court’s judgment on the mismanagement-of-trust claim and render a judgment in favor of Emma’s estate.

B. Conversion

For a conversion claim to stand,
“ ‘there must be a wrongful taking or a wrongful detention or interference, an illegal assumption of ownership, or an illegal use or misuse of another’s property. Covington v. Exxon Co. U.S.A., 551 So.2d 935, 938 (Ala.1989). “The gist of the action is the wrongful exercise of dominion over property in exclusion or defiance of a plaintiffs rights, where said plaintiff has general or special title to the property or the immediate right to possession.” Ott v. Fox, 362 So.2d 836 (Ala.1978) (emphasis added).’ ”
Horne v. TGM Assocs., L.P., 56 So.3d 615, 628 (Ala.2010) (quoting Baxter v. South-Trust Bank of Dothan, 584 So.2d 801, 804-05 (Ala.1991)). See Ex parte Anderson, 867 So.2d 1125, 1129 (Ala.2003). Further, “[a] plaintiff must establish that the defendant converted specific personal property to his own use and beneficial enjoyment or that the defendant destroyed or exercised dominion over property to which, at the time of the conversion, the plaintiff had a general or specific title and of which the plaintiff was in actual possession or to which he was entitled to immediate possession.” Rice v. Birmingham Coal & Coke Co., 608 So.2d 713, 714 (Ala.1992).
The conversion claim was brought on behalf of Eddie’s estate concerning Eddie’s personal property located at the cotton-gin office, where he lived before he died, and some furniture located in the Westwood house. The jury returned a verdict against the Beasley branch, both Emma’s estate and Mary, for $3,645 in compensatory damages. Initially, based on the record before us, we must conclude that there was no evidence indicating that Emma converted Eddie’s personal property. Instead, the evidence showed that only Mary was involved in the disposition of Eddie’s personal property. Consequently, the Young branch failed to present evidence from which a jury could find that Emma had converted Eddie’s property. Because the evidence does not support a finding of conversion against Emma, the trial court erred in denying the motion for a JML filed by Emma’s estate as to the conversion claim against her. Therefore, the conversion claim against Emma’s estate should not have been submitted to the jury, and the trial court’s order denying the motion for a JML as to Emma’s estate is due to be reversed. We therefore render a judgment in favor of Emma’s estate on the conversion claim.
We, however, must consider the conversion claim as to Mary. Mary argues that the trial court erred in denying a JML on the conversion claim as to her because, she says, her refusal to surrender Eddie’s personal property was reasonable and qualified. Whether there is a reasonable qualified refusal to surrender personal property presents a jury ques *989 tion. White v. Drivas, 954 So.2d 1119, 1124 (Ala.Civ.App.2006). See Gabrielson v. Healthcorp of Eufeula, Inc., 628 So.2d 411, 414 (Ala.1993). In this case, there was sufficient evidence from which a jury could have found that Mary had converted Eddie’s personal property. Thus, the trial court properly submitted the conversion claim as to Mary to the jury. The jury rejected the qualified-refusal argument and returned a verdict in the amount of $3,645. Because the compensatory-damages award was joint and several in nature and because there is sufficient evidence indicating that Mary converted Eddie’s personal property to support the jury verdict, we affirm the judgment on the conversion claim against Mary.

C. Punitive Damages

Because we conclude that the trial court erred in denying the Beasley branch’s motions for a JML on the mismanagement-of-trust claim, we reverse the award of punitive damages on that claim. Thus, we need only consider whether the punitive damages can stand against Mary on the conversion claim. We conclude that we must reverse the punitive-damages award against Mary on the conversion claim.
“Conversion is an intentional tort.” Johnson v. Northpointe Apartments, 744 So.2d 899, 904 (Ala.1999). “Intentional torts ordinarily carry punitive damages, if the jury chooses to award them.” Tillis Trucking Co. v. Moses, 748 So.2d 874, 887 n. 12 (Ala.1999). “Punitive damages are recoverable in a conversion case when the evidence shows legal malice, willfulness, insult, or other aggravating circumstances.” Schwertfeger v. Moorehouse, 569 So.2d 322, 324 (Ala.1990). See Ex parte Norwood Hodges Motor Co., 680 So.2d 245, 249 (Ala.1996).
To warrant punitive damages under the conversion claim, the Young branch must present clear and convincing evidence indicating that Mary “consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard” to the Young branch, § 6 — 11—20(b)(1), Ala.Code 1975. There is no clear and convincing evidence indicating that Mary possessed such intent or knowledge. Therefore, there was no basis for an award of punitive damages on the conversion claim. We, therefore, reverse the judgment awarding punitive damages to the Young branch on the mismanagement-of-trust claim and the conversion claim.

D. Furnishings and Heirlooms in Westwood House

The Beasley branch argues that the Westwood furnishings and heirlooms were a part of the Trust, as was the house itself, and, it says, it was entitled to a JML on the Young branch’s claim to one-half of the furnishings and heirlooms in the West-wood house. The Beasley branch also argues that the jury’s assessment of the value of the furnishings and heirlooms based upon an appraisal was in error.
Our review of the record indicates that all evidence as to ownership of the furnishings and heirlooms in the Westwood house proved that the Young branch — Eddie’s estate, Billy, and Adele — had an undivided one-half interest in the furnishings and heirlooms at Westwood. The record does not show that the furnishings and heirlooms of Westwood were part of the Trust. Instead, the Young branch received, under Lyle’s will, a one-half undivided interest in the furniture, furnishings, and personal property in the Westwood house. Regardless, assuming without deciding that the furnishings and heirlooms were a part of the Trust, the Young branch was entitled to a distribution of their share upon the *990 death of the remaining trust beneficiary, Emma, in June 2010.
In this case, the jury determined that the Young branch had a one-half interest in the furniture, furnishings, jewels, portraits, and personal items. The jury also determined that the total value of the personal property at Westwood was $172,000. The jury heard testimony from a number of experts concerning the value and uniqueness of the personal property and received into evidence an appraisal. Therefore, we affirm the trial court’s judgment on the jury’s verdict in that regard.

E. Counterclaims for Money Loaned

The Beasley branch presented counterclaims against Eddie’s estate, Billy, and Adele, as well as a claim against Veronica, Billy’s wife. At trial, the Beasley branch submitted documents and exhibits to support its claims. Specifically, the Beasley branch claimed that Eddie’s estate owed the Beasley branch $28,304.06, that Billy owed $67,331.92, and that Adele owed $5,317.97. The Beasley branch claimed that Veronica owed a portion of the amount owed by her husband, Billy. The Beasley branch argued that these amounts included the judgment in the amount of $28,000 resulting from the 1998 suit for partition filed by Billy in Marengo County. The jury reviewed and considered the documents submitted by the Beasley branch and entered a $0 verdict on the counterclaims against Eddie’s estate and Adele. On the counterclaims against Billy and Veronica, the jury entered a verdict of $8,043.48 against Billy and $8,043.48 against Veronica.
The Beasley branch argues that the jury’s verdict on its counterclaims did not nullify the $28,000 Marengo County judgment against the Young branch. The Beasley branch also argues that it was entitled to a JML in its favor on its counterclaims for money loaned to the Young branch.
The Beasley branch’s argument, however, ignores the fact that the jury had before it documents and exhibits supporting its claims, including the Marengo County judgment in the amount of $28,000. The Beasley branch cannot now complain that it was error for the jury to consider the $28,000 judgment. “A jury’s verdict is presumed correct, and that presumption is strengthened by the trial court’s denial of a motion for a new trial. Wal-Mart Stores, Inc. v. Goodman, 789 So.2d 166 (Ala.2000).” Cochran v. Ward, 935 So.2d 1169,1176 (Ala.2006). Further, our review of the record indicates that the jury considered in detail the counterclaims for money loaned. Consequently, we affirm the trial court’s judgment on the jury verdict on the Beasley branch’s counterclaims.

IV. Conclusion

The trial court erred in denying the Beasley branch’s motions for a JML as to the mismanagement-of-trust claim. We, therefore, reverse the judgment as to the mismanagement-of-trust claim and render a judgment in favor of Emma’s estate and Mary on that claim. Because the trial court should have granted the Beasley branch’s motions for a JML on the mismanagement-of-trust claim, we reverse that portion of the judgment awarding punitive damages on the jury’s finding of mismanagement of trust.
The trial court also erred in denying the motion for a JML filed by Emma’s estate as to the conversion claim. We, therefore, reverse the judgment as to the conversion claim against Emma’s estate and render a judgment in favor of Emma’s estate on that claim. We affirm the judgment as to the conversion claim against Mary, including the amount of the compensatory damages awarded the Young branch on that *991 claim. However, because there is no clear and convincing evidence that Mary “consciously and deliberately engaged in oppression, fraud, wantonness, or malice,” we reverse the trial court’s judgment insofar as it awarded punitive damages on the conversion claim against Mary, as well as against Emma’s estate. We affirm the judgment as to the Young branch’s one-half interest in the furnishings and heirlooms in the Westwood house and on the Beasley branch’s counterclaims for money loaned.
AFFIRMED IN PART, REVERSED IN PART, AND JUDGMENT RENDERED.
STUART, BOLIN, PARKER, SHAW, WISE, and BRYAN, JJ., concur.
MOORE, C.J., and MURDOCK, J, concur specially.

. Following appellate mediation, this case was assigned to Justice Main on July 24, 2013.

. Emma and Lyle had a brother who was killed in World War II. At the time of his death, he was not married and did not have any children.

. Mary Leila Beasley Schaeffer had one son, Kurt, who died in an automobile accident in June 2008. Kurt had one child, a daughter, Juliet Alexandra Schaeffer, who was six years old at the time of trial and who was living with her mother in Kansas.

.Emma’s husband, James Samuel Beasley, Jr., died around 1950.

. Ellis filed a motion for substitution after she was appointed personal representative. The trial court entered an order granting Ellis’s motion for substitution.

. The Beasley branch’s counterclaim alleged a claim against Billy’s wife, Veronica, for money loaned.

. The Beasley branch filed a motion to vacate the trial court’s appointment of Mackey as trustee, arguing that the Trust expressly listed Emma's daughter, Ellis, as successor trustee in a scenario such as this one. The trial court later granted the motion to vacate in light of an agreement of the parties, following a temporary remand by this Court for the purpose of giving the trial court jurisdiction.

. The parties agree that Texas trust law was applicable to the issues in this matter relating to the Trust.