Rel: January 10, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

_____

### SC-2023-0401

_____

### Exxon Mobil Corporation

### v.

### Adam P. Harrington

_____

### SC-2023-0424

_____

### Adam P. Harrington

### v.

**Exxon Mobil Corporation**

**Appeals from Mobile Circuit Court**
**(CV-18-903102)**

STEWART, Justice.

Exxon Mobil Corporation ("Exxon") appeals from a judgment entered against it and in favor of Adam P. Harrington by the Mobile Circuit Court ("the trial court") in an action brought by Harrington to recover for injuries he sustained while performing work for his employer on an offshore gas platform located in the Gulf of Mexico. Exxon contends that it is entitled to a new trial because, it argues, the trial court erred in excluding certain evidence regarding payment of Harrington's medical expenses by his employer's workers' compensation insurer. Harrington conditionally cross-appeals from the judgment, arguing that, should the judgment in his favor be reversed, the trial court's judgment as a matter of law on his wantonness claim against Exxon should also be reversed. For the following reasons, we affirm the judgment against Exxon, and we dismiss Harrington's cross-appeal as moot.

<u>Facts and Procedural History</u>

On February 15, 2018, Harrington was injured while using a swing rope to transfer himself from an offshore gas platform to a transport vessel. At the time of the accident, Harrington was employed by Skelton's Fire Equipment, Inc. ("Skelton's"), as a fire-suppression-equipment inspector. Skelton's had been engaged by Exxon to inspect the fire-suppression equipment located on one of Exxon's offshore gas platforms located in Mobile Bay, known as "B-Deck." In many of its offshore gas platforms, including B-Deck, Exxon employed a swing rope to facilitate the movement of personnel between the platform and transport vessels. For instance, to transfer from the platform to a transport vessel, an individual is required to grasp onto the swing rope, which is permanently affixed to the platform, and swing over onto the back of the transport vessel. The record indicates that swing-rope transfers are common in the Gulf of Mexico, and are usually performed without incident, but can be challenging due to the pitch and roll of the transport vessel when sea conditions are other than calm. Harrington, who did not typically work offshore, had used a swing rope only on a few occasions before the February 15, 2018, accident. On that date, the seas were rougher than he had previously experienced, and, as Harrington

3

sought to swing over to the transport vessel, the vessel was moving up and down. Harrington mistimed his swing, and he fractured his leg when he let go of the rope and dropped three feet onto the deck of the transport vessel. Harrington's medical expenses were paid by Skelton's workers' compensation insurer.

On December 6, 2018, Harrington initiated this action against Exxon. Harrington's complaint, as amended, asserted claims of maritime negligence and wantonness. Before trial, Harrington filed a motion in limine asking the trial court to exclude, among other things, evidence indicating that his medical bills had been paid by his employer's workers' compensation insurer. The trial court granted that motion in part, concluding that the parties could offer evidence of the amount of medical expenses billed as well as the amount ultimately paid and accepted by the medical providers. The trial court, however, ruled that "[t]he source of any payment is prohibited by the collateral source rule."

A jury trial was conducted between January 31, 2023, and February 8, 2023. At the close of the evidence, Exxon moved for a judgment as a matter of law, which the trial court granted as to Harrington's claim of wantonness. On February 8, 2023, the jury returned a verdict in favor of

Harrington and against Exxon and awarded compensatory damages in the amount of $1,500,000. The jury also found that Harrington was 10% at fault for his own injuries. The trial court entered a judgment on the jury's verdict on February 8, 2023, in the amount of $1,350,000, which represented a 10% reduction in the jury's damages verdict.

Exxon filed a postjudgment motion for a new trial, in which it argued that the trial court had erred in excluding evidence indicating that Harrington's employer's workers' compensation insurer had paid for his medical treatment. That motion was denied on April 26, 2023, and these appeals followed.

## Standard of Review

> "'"It is well established that a ruling on a motion for a new trial rests within the sound discretion of the trial judge. The exercise of that discretion carries with it a presumption of correctness, which will not be disturbed by this Court unless some legal right is abused and the record plainly and palpably shows the trial judge to be in error.'"
>
> "'Curtis v. Faulkner Univ., 575 So. 2d 1064, 1065-66 (Ala. 1991) (quoting Kane v. Edward J. Woerner & Sons, Inc., 543 So. 2d 693, 694 (Ala. 1989), quoting in turn Hill v. Sherwood, 488 So. 2d 1357, 1359 ([Ala.] 1986)).'

"Baptist Med. Ctr. Montclair v. Whitfield, 950 So. 2d 1121, 1126 (Ala. 2006).

"In addition to this general standard, this Court has also addressed the standard of review specifically applied to evidentiary rulings of a trial court:

"'"'The standard applicable to a review of a trial court's rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence.'" Mock v. Allen, 783 So. 2d 828, 835 (Ala. 2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So. 2d 651, 655 (Ala. 1998)) ….

"'"'The second principle "is that a judgment cannot be reversed on appeal for an error [in the improper exclusion of evidence] unless … it should appear that the error complained of has probably injuriously affected substantial rights of the parties."'" Mock, 783 So. 2d at 835 (quoting Wal-Mart Stores, 726 So. 2d at 655, quoting in turn Atkins v. Lee, 603 So. 2d 937, 941 (Ala. 1992)). See also Ala. R. App. P. 45. "The burden of establishing that an erroneous ruling was prejudicial is on the appellant." Preferred Risk Mut. Ins. Co. v. Ryan, 589 So. 2d 165, 167 (Ala. 1991).'

"Middleton v. Lightfoot, 885 So. 2d 11, 113-14 (Ala. 2003) (emphasis omitted)."

Leftwich v. Brewster, 306 So. 3d 26, 33 (Ala. 2020).

## Analysis

This action concerns alleged maritime torts governed by substantive maritime law. Although maritime-tort actions may be commenced in state court under the "saving-to-suitors" clause of 28 U.S.C. § 1333, see American Dredging Co. v. Miller, 510 U.S. 443, 446-57 (1994), "[w]hen an action is brought in state court for a tort within the jurisdiction of admiralty law, … the state court must apply the principles of admiralty." Kennedy Engine Co. v. Dog River Marina & Boatworks, Inc., 432 So. 2d 1214, 1215 (Ala. 1983); see also East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864 (1986) ("With admiralty jurisdiction comes the application of substantive maritime law."). State law, however, is not completely supplanted when a state court adjudicates a maritime claim, and state law -- including, for example, procedural rules of court -- may be applied so long as the state law does not work "'material prejudice to the characteristic features of the general maritime law or interfere[] with the proper harmony and uniformity of that [admiralty] law ….'" American Dredging Co., 510 U.S. at 447 (quoting Southern Pac. Co. v. Jensen, 244 U.S. 205, 216 (1917)).

At issue in this case is the application of the collateral-source rule. The collateral-source rule applies to maritime-tort actions. See Higgs v.

7

<u>Costa Crociere S.P.A. Co.</u>, 969 F.3d 1295, 1311 (11th Cir. 2020) ("It is …

well established that the collateral source rule -- both in its substantive

and evidentiary roles -- applies to maritime tort cases.").  In <u>Higgs</u>, the

United States Court of Appeals for the Eleventh Circuit explained the

collateral-source rule:

> "The collateral source rule is both a substantive principle of damages and an evidentiary rule.  In its substantive role, the collateral source rule provides that a plaintiff is entitled to recover the full value of the damages caused by a tortfeasor, without offset for any amounts received in compensation for the injury from a third party (like an insurance company or a family member).  <u>See</u> <u>Bourque v. Diamond M. Drilling Co.</u>, 623 F.2d 351, 354 (5th Cir. 1980).  Restatement (Second) of Torts § 920A(2) ('Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable.').  In its evidentiary role, the collateral source rule bars the admission of evidence of payments made by third parties.  <u>Bourque</u>, 623 F.2d at 354 ('[T]he rule prohibits the introduction of evidence offered to show that [a plaintiff] already has been compensated for his injuries.')."

969 F.3d at 1310 (footnote omitted).  The <u>Higgs</u> court further explained

that "[t]he evidentiary role of the collateral source doctrine acts as a

prophylactic, shielding the jury from evidence that is likely to encourage it to violate the substantive role of the rule." Id. at 1314.[1]

Alabama historically applied the common-law collateral-source rule. In 1987, however, our Legislature enacted § 12-21-45, Ala. Code 1975, which effectively abrogated the collateral-source rule in civil actions in Alabama when damages for medical or hospital expenses are claimed. See Senn v. Alabama Gas Corp., 619 So. 2d 1320, 1325 (Ala. 1993) ("[T]he collateral source rule, insofar as it allowed recovery against a tort-feasor of medical expenses paid by a collateral source, was abrogated by Ala. Code 1975, § 12-21-45."). Section 12-21-45 provides, in pertinent part:

> "(a) In all civil actions where damages for any medical or hospital expenses are claimed and are legally recoverable for personal injury or death, evidence that the plaintiff's medical or hospital expenses have been or will be paid or

---

[1]The issue in Higgs was whether a medical provider's acceptance of a lower amount than initially billed to settle a medical debt constituted a collateral-source payment. The Higgs court concluded that such a "write-off" of medical expenses is not a collateral-source payment. The Higgs court held that "the appropriate measure of past medical expense damages in a maritime tort case is the amount determined to be reasonable by the jury upon its consideration of all relevant evidence, including the amount billed, the amount paid, and any expert testimony and other relevant evidence the parties may offer." 969 F.3d at 1317. Higgs's statement of maritime-tort damages was adopted by the trial court in this case.

reimbursed shall be admissible as competent evidence. In such actions upon admission of evidence respecting reimbursement or payment of medical or hospital expenses, the plaintiff shall be entitled to introduce evidence of the cost of obtaining reimbursement or payment of medical or hospital expenses.

"(b) In such civil actions, information respecting such reimbursement or payment obtained or such reimbursement or payment which may be obtained by the plaintiff for medical or hospital expenses shall be subject to discovery.

"(c) Upon proof by the plaintiff to the court that the plaintiff is obligated to repay the medical or hospital expenses which have been or will be paid or reimbursed, evidence relating to such reimbursement or payment shall be admissible."

Exxon observes that § 12-21-45 is, on its face, merely a neutral rule of evidentiary procedure. Exxon, thus, contends that § 12-21-45, as a neutral rule of evidentiary procedure, is compatible with maritime law. Therefore, Exxon argues that the trial court erred when it precluded Exxon from offering evidence indicating that Harrington's medical expenses had been paid, and would be paid in the future, by his employer's workers' compensation insurer. We disagree. Although § 12-21-45 is a statute that, in part, addresses evidentiary procedure regarding admissibility and discovery, because it modified Alabama's

10

common-law collateral-source rule, it is also substantive law. As the

Court of Civil Appeals has explained:

> "Section 12-21-45 modifies the substantive component of the collateral-source rule. See Melvin v. Loats, 23 So. 3d 666, 669 (Ala. Civ. App. 2009). Whereas under the common-law collateral-source rule a jury could not in any case decrease the amount of damages awarded on account of a plaintiff's receipt of third-party payments of medical and hospital expenses, under § 12-21-45 a jury can now decide, based on the unique facts of each case, whether such a reduction would be appropriate. See Senn v. Alabama Gas Corp., 619 So. 2d 1320, 1325 (Ala. 1993)."

Crocker v. Grammer, 87 So. 3d 1190, 1193 (Ala. Civ. App. 2011).

Thus, regarding consideration of collateral-source payments when

a personal-injury claimant seeks recovery of medical expenses,

Alabama's policy differs from substantive maritime law, which maintains

a "substantive rule of no reduction." Phillips v. Western Co. of N. Am.,

953 F.2d 923, 929 (5th Cir. 1992). Here, the trial court was required to

apply substantive maritime law, and with it the collateral-source rule.

Thus, application of § 12-21-45 to permit the admission of evidence

regarding payment of Harrington's medical expenses by an insurer for

the purpose of permitting the jury to reduce Harrington's recovery would

have violated substantive maritime law or, at least, would have

11

encouraged the jury to violate that law. Accordingly, the trial court did not err in granting Harrington's motion to exclude such evidence.

Next, Exxon asserts that, even if evidence indicating that Harrington's medical expenses had been paid, and would be paid in the future, by his employer's workers' compensation insurer was inadmissible under the collateral-source rule, Harrington nevertheless opened the door to the admission of such evidence at trial. Specifically, Exxon points to testimony given by Dr. Catherine Brock, an occupational therapist retained by Harrington to provide expert "life-care planning" testimony. As part of Dr. Brock's expert-opinion testimony, she provided a "life-care plan" that projected that Harrington would have around $240,000 in future-care needs. Dr. Brock indicated that that figure was based on "retail" hospital charges for Harrington's expected future medical care.

During Exxon's cross-examination of Dr. Brock, Exxon offered an account statement from the hospital where Harrington had been treated. That statement, which had insurance and payor information redacted, showed charges of $34,670.13, total payments of $18,620, and an adjustment of $16,050.13. During Dr. Brock's cross-examination, counsel

for Exxon questioned her on whether Harrington could expect similar adjustments as to his future medical expenses. The following colloquy took place:

"Q: Is it often the case that the submitted charges by the hospital are a lot more than what the hospital actually accepts?

"A: That's common.

"Q: In this case the charge -- and we are talking about Mr. Harrington's previous care -- before we get to your plan. Is that right?

"A: Yes.

"Q: The previous care, the payment the hospital actually accepted is $18,620.

"A: That's correct.

"Q: And then they gave an adjustment or discount of $16,000?

"A: Yes.

"Q: That's common in the industry?

"A: It's common to negotiate charges by third party payers and --

"Q: Let's stop there. We have got some rulings that I have to deal with. I don't mean to be rude at all. I'm sorry. If I did my math right, in this particular instance Springhill hospital accepted about fifty-four percent of that submitted charge. Does that look about right? …

13

"A:    Yes.

"Q:    So the reason I ask is this, you have costed out … that surgery and two revisions … at $177,000.  That's really the bulk of the money in this plan.  Right?

"A:    Correct.

"Q:    But that is for the submitted charges?

"A:    Covered charges.

"Q:    Submitted covered charges?

"A:    Yes.

"Q:    It doesn't include a discount like we saw before?

"A:    No.   That is not standard methodology in life care planning.

"Q:    I understand.  You don't do it that way.  You do the one charge.

"A:    <u>Well, there is no way to know the negotiated rate or if a third party would be present to negotiate</u>.

"Q:    Excuse me.  I'm going to cut you off again.  Forgive me.  But if the discount we see from Springhill for the surgery they just did holds true to the future surgery, assuming he goes back to Springhill and gets the same discount, then that $177,000 that you costed for the knee replacement and two revisions that is going to go down by forty-six percent to $95,000, if my math is right.  Right?  If the future is like the past?

"….

"A:   <u>I guess you are asking me to assume there would be a negotiator in this</u>.

"….

"Q:   All I'm asking is, if Springhill accepts the same discount in the future that they accepted in the past, assuming he does the surgeries there, even with the two revisions those surgeries will cost some forty-six percent less than your number.

"A:   Yes.

"….

"Q:   So, I just wanted to make the point again.  The way you do it, you use submitted and then that differs in many cases from what the providers are paying?

"A:   <u>It can be negotiated, yes</u>.

"….

"Q:   Assume that the past medicals all meshed together have been discounted by forty-one percent.  …  Assume that those percentages stay the same in the future for what you have done with your work.  ...  Assume that my math is right.  We would need to do the accepted prices -- If the future is like the past, we would need to turn that -- we would need to discount that $240,000 by forty-one percent.  Right?

"A:   <u>Assuming that there is a third party to negotiate a third party payer</u>."

(Emphasis added.)  On redirect, Harrington's counsel asked Dr. Brock

the following:

"Q: [Harrington] is going to have at least some of these medical services in the future?

"A: Yes.

"Q: The charges are going to be made. <u>He is not a third party vendor</u>?

"A: Correct."

(Emphasis added.)

Following Dr. Brock's testimony, Exxon argued to the trial court that the above-emphasized testimony had opened the door to proof that Harrington's past medical expenses had been paid by his employer's workers' compensation insurer and that his future medical expenses will also be paid by the workers' compensation insurer. The trial court, however, maintained its ruling excluding evidence indicating that Harrington's medical expenses had been paid by insurance.

On appeal, Exxon contends that evidence as to the payment of Harrington's medical expenses by his employer's workers' compensation insurer should have been admitted at trial under the doctrine of curative admissibility.

> "'"Curative Admissibility is a doctrine which holds that if a party introduces illegal evidence, his opponent has the

16

> unconditional right to rebut such evidence with other illegal evidence."'

"<u>Kelley v. State</u>, 405 So. 2d 728, 730 (Ala. Crim. App. 1981) (quoting C. Gamble, <u>McElroy's Alabama Evidence</u> § 14.01 (3d ed. 1977)). However, that rule is limited.

> "'"The rule is applicable even if the opponent failed to object to the original illegal or inadmissible evidence. <u>A limitation upon this doctrine is the rule that the illegal rebuttal evidence may be admitted only to the extent that it cures the effect of the admission of the first illegal evidence</u>. If, for example, a party introduces evidence of a hearsay conversation then his opponent has the right to introduce only so much of the remainder of the conversation as rebuts the portion first offered."
>
> "'C. Gamble, <u>McElroy's Alabama Evidence</u>, Section 14.01 (3rd ed. 1977).
>
> "'The doctrine of curative admissibility is <u>limited to the extent that it cures the effect of the admission of the first illegal evidence</u>. <u>Hall v. State</u>, 375 So. 2d 536 (Ala. Cr. App. 1977). Since the testimony of [the] victim's nephew was limited to that of deceased being a "nice guy" to the nephew and helped people out and did things, any rebuttal or curative testimony would have to be restricted [to] showing that the victim was not a "nice guy" and did not "help out people and do things." Since a crime of moral turpitude would do little to rebut such testimony, <u>it would have been inappropriate for the judge to have let such unrelated prior acts in evidence</u>.'

"405 So. 2d at 730 (emphasis added).  See also <u>American Fire</u> <u>& Cas. Ins. Co. v. Bryan</u>, 379 So. 2d 605, 609 (Ala. Civ. App. 1979) ('The curative admissibility doctrine holds that if one party introduces illegal evidence, his opponent has the unconditional right to rebut such evidence....  However, this doctrine is subject to the <u>important qualification that matters not relevant to the issues on trial may not be brought out</u>.' (emphasis added))."

<u>Baptist Health Sys., Inc. v. Cantu</u>, 264 So. 3d 41, 46-47 (Ala. 2018).

Furthermore,

"[w]hen illegal evidence is admitted, thus activating application of the curative admissibility doctrine, the responsive evidence must satisfy a special test of relevancy. It must be relevant in the sense of having a logical tendency to rebut the illegal evidence already admitted.  It may be said that evidence offered under the curative admissibility doctrine may be admitted only to the extent that it cures, contradicts, or neutralizes the force and effect of the evidence improperly adduced by the adverse party."

1 Charles W. Gamble et al., <u>McElroy's Alabama Evidence</u> § 14.01(6) (7th ed. 2020) (footnotes omitted).

In this case, Exxon argues that Dr. Brock's testimony could have led the jury to the incorrect conclusion that Harrington would be personally responsible, with no third-party help, for full undiscounted future medical charges.  Thus, Exxon argues that that testimony opened the door to the admission of evidence indicating that a third party --

18

Harrington's employer's workers' compensation insurer -- had paid his medical expenses and would likewise pay his future medical expenses. We, however, cannot say that the trial court erred in refusing to admit that evidence. We note that Dr. Brock's testimony in response to Exxon's counsel's questions was suggestive of the fact that a third party had, indeed, negotiated a discount on Harrington's previous medical expenses and that it was possible that it would do so in the future. To the extent that it referenced third-party payors, Dr. Brock's testimony arguably violated the trial court's previous ruling barring evidence of collateral-source payments. However, Exxon's purported rebuttal testimony -- that Harrington's employer's workers' compensation insurer had paid his medical expenses[2] -- would not have rebutted, cured, or neutralized Dr. Brock's testimony: rather, it would have served to emphasize and

---

[2]Exxon informed the trial court that it was prepared to call a representative from the payor workers' compensation insurer who would testify that that insurer had paid Harrington's past medical expenses and would pay his future medical expenses. Exxon did not, however, contend that its evidence would have established that the insurer had negotiated adjustments to Harrington's medical expenses, and such a claim is not supported by the record.

19

expound upon Dr. Brock's collateral-source testimony.[3]  Thus, we conclude that the trial court did not exceed its discretion in refusing to admit the collateral-source-payment evidence under the curative-admissibility doctrine.

Conclusion

For the above reasons, the judgment entered by the trial court against Exxon and in favor of Harrington is affirmed.  Harrington's conditional cross-appeal challenging the trial court's judgment as a matter of law on his claim of wantonness is dismissed as moot.  Williams v. Lide, 628 So. 2d 531, 538 (Ala. 1993).

SC-2023-0401 -- AFFIRMED.

---

[3]Exxon further posits that Dr. Brock's testimony that Harrington was "not a third-party vendor," coupled with her earlier testimony purportedly suggesting that reductions are negotiated only by third-party payors, improperly suggested to the jury that there would be no third party to negotiate a reduced settlement of future medical expenses. That Harrington was not a third-party vendor, however, was an obvious truism requiring no rebuttal.  Nor would the purported implication of such testimony be rebutted by evidence of prior collateral-source payments.  If anything, the testimony suggested what Exxon had sought to prove -- that there was a third party that had paid and/or negotiated Harrington's medical expenses, because, if adjustments are only negotiated by third-party payors, and Harrington is not a third-party payor, then the prior adjustments were necessarily negotiated by a third-party payor and not Harrington.

Parker, C.J., and Shaw and Bryan, JJ., concur.

Mendheim, J., concurs in the result, with opinion, which Mitchell, J., joins.

Cook, J., concurs in the result, with opinion, which Wise, J., joins.

Sellers, J., dissents.

SC-2023-0424 -- APPEAL DISMISSED.

Parker, C.J., and Shaw, Wise, Bryan, Sellers, Mendheim, Mitchell, and Cook, JJ., concur.

MENDHEIM, Justice (concurring in the result in case no. SC-2023-0401).

Based on the record before us, I cannot conclude that the trial court exceeded its discretion by denying the motion for new trial filed by Exxon Mobil Corporation ("Exxon"). First, Exxon was granted the relief that it requested in its response to the motion in limine filed by Adam P. Harrington, and Exxon did not argue in that response that it was entitled to introduce evidence regarding the source of payment of Harrington's medical expenses. Thus, any purported error as to the trial court's ruling in that regard was not preserved for review. See Andrews v. Merritt Oil Co., 612 So. 2d 409, 410 (Ala. 1992) ("This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court.").

Second, regarding Exxon's contention that the trial court erred by not concluding that Harrington had opened the door to the admission of such evidence, the trial court's ruling on the admissibility of evidence will not be disturbed on appeal unless the trial court exceeded its discretion. See Alabama River Grp., Inc. v. Conecuh Timber, Inc., 261 So. 3d 226, 256 (Ala. 2017). Based on the record before us, I cannot conclude that the trial court exceeded its discretion when it decided that Harrington

had not opened the door to the admission of evidence regarding the source of payment. See id. (describing "such matters as admissibility of evidence, including under the doctrine of curative admissibility," as being within the "'"great discretion"' of the trial court, Bowers v. Wal-Mart Stores, Inc., 827 So. 2d 63, 71 (Ala. 2001) (quoting Sweeney v. Purvis, 665 So. 2d 926, 930 (Ala. 1995))").

Mitchell, J., concurs.

COOK, Justice (concurring in the result in case no. SC-2023-0401).

I concur in the result in case no. SC-2023-0401. The key question in these consolidated appeals is whether the defendant, Exxon Mobil Corporation, was entitled to introduce evidence indicating that the past and future medical bills of the plaintiff, Adam P. Harrington, are covered by his employer's workers' compensation insurance. Exxon contends that it was entitled to introduce such evidence for two reasons.

First, Exxon contends that it was entitled to present such evidence during trial because Alabama's statute abrogating the collateral-source rule and authorizing the admissibility of evidence indicating that a plaintiff's medical or hospital expenses have been or will be paid or reimbursed, see § 12-21-45, Ala. Code 1975, applies in this case. The main opinion concludes that the Mobile Circuit Court properly excluded that evidence because substantive maritime law and the collateral-source rule mandate the exclusion of such evidence. However, as explained below, I do not believe that we need to address this issue because it is not properly before us.

Second, Exxon argues that, even if such evidence was inadmissible, Harrington nevertheless opened the door to its admission at trial.  As

explained below, because Harrington will actually pay his future medical bills and because of the standard we must employ for reviewing an evidentiary issue on a request for a new trial, I do not believe that Exxon has demonstrated that it is entitled to a new trial on that basis.

I. Whether Exxon's Argument Concerning the Applicability of § 12-21-45 is Properly Before Us

Exxon first argues on appeal that the trial court should have admitted evidence of Harrington's past and future medical bills being covered by his employer's workers' compensation insurance. Although the collateral-source rule historically barred admission of such evidence, Exxon points to a tort-reform statute passed in 1987 by the Alabama Legislature -- § 12-21-45, Ala. Code 1975 -- that abrogated that rule. Under that statute, "evidence that the plaintiff's medical or hospital expenses have been or will be paid or reimbursed shall be admissible as competent evidence." § 12-21-45(a).

Here, Harrington's claims against Exxon were brought in an Alabama state court, which means that Alabama evidence rules apply. However, those claims arise under maritime law and not under Alabama law. Under maritime law, a plaintiff is not prohibited from recovering as damages medical or hospital expenses, even if those expenses have been

reimbursed. See Higgs v. Costa Crociere S.P.A. Co., 969 F.3d 1295, 1311 (11th Cir. 2020).

Exxon argues that even though Harrington's claim arises under maritime law, the Alabama statute can still apply and allow the admission of this evidence. In other words, Exxon argues that § 12-21-45 is a mere rule of evidence. Thus, Exxon says, it abrogates only the procedural component of the common-law collateral source rule and is, therefore, compatible with maritime law. Accordingly, Exxon contends that the trial court erred when it precluded Exxon from offering evidence indicating that Harrington's medical expenses had been paid, and would be paid in the future, by his employer's workers' compensation insurer.

Although the main opinion disagrees with Exxon's position and concludes that such an "application of § 12-21-45 … would have violated substantive maritime law or, at least, would have encouraged the jury to violate that law," ____ So. 3d at ____, I do not believe that we need to reach this issue because Exxon did not raise these specific arguments to the trial court.

The record reflects that Harrington filed a motion in limine asking the trial court to exclude any evidence indicating that his medical

26

expenses were covered by his employer's workers' compensation insurance. In support of that motion, Harrington argued that maritime cases pending in state courts are governed by substantive maritime law. Harrington claimed that because "[t]he collateral source rule is a substantive law [and] is applicable under General Maritime law," the rule must therefore apply to exclude this evidence.

In response to Harrington's motion in limine, Exxon advocated that the trial court should follow the decision of the United States Court of Appeals for the Eleventh Circuit in Higgs v. Costa Crociere S.P.A. Co., 969 F.3d 1295 (11th Cir. 2020). In that case, the Eleventh Circuit Court of Appeals noted that it is "well established that the collateral source rule -- both in its substantive and evidentiary roles -- applies to maritime tort cases." 969 F.3d at 1311. However, that court also held that "[b]oth the amount billed by healthcare providers and the amount paid by insurers are admissible as relevant to the question of fixing reasonable value." Id. at 1308 (final emphasis added). In support of its holding, that court explained that, "to the extent a plaintiff worries she may be prejudiced by the jury's knowledge of the fact that she is insured, the district court may choose to admit into evidence only the total amount for which the

medical bills were settled, without reference to who settled them." Id. at 1316 (emphasis altered).

Exxon argued that, per Higgs, it must be allowed to introduce evidence of the rate difference for medical treatment; thus, it asserted, the trial court should "allow into evidence both the retail and negotiated payment amounts." (Emphasis added.) Exxon also argued that Higgs is "largely consistent with Code of Alabama section 12-21-45, which statutorily abrogated the collateral source rule for medical and hospital expenses under Alabama damages law." (Emphasis added.)

Relying upon Higgs, the trial court denied Harrington's motion in limine in part, ruling that "'[t]he appropriate measure of past medical expense damages in a maritime tort case is the amount determined to be reasonable by the jury upon [it's] consideration of all relevant evidence …, including the amount billed, the amount paid, and any expert testimony and other relevant evidence the parties may offer.'" (Quoting Higgs, 969 F.3d at 1317) (emphasis in the trial court's order). However, the trial court also granted Harrington's motion in part and ruled that "[t]he source of any payment is prohibited by the collateral source rule." (Emphasis added.)

In other words, the trial court basically did what Exxon was asking it to do per the Eleventh Circuit Court of Appeals' decision in <u>Higgs</u> by allowing evidence of the "<u>amount</u>" paid. However, now, on appeal, Exxon is asserting that it also should have been able to introduce evidence of the <u>source</u> of the payments for Harrington's past and future medical expenses pursuant to § 12-21-45 because that statute is merely a <u>procedural</u> rule rather than a substantive rule. Exxon's brief at 23. Exxon's argument here is substantively different from the argument that it raised in response to Harrington's motion in limine below.

It is well established that "'"[t]his Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court."'" <u>Brown v. Berry-Pratt</u>, 315 So. 3d 566, 572 (Ala. 2020) (quoting <u>Marks v. Tenbrunsel</u>, 910 So. 2d 1255, 1263 (Ala. 2005), quoting in turn <u>Andrews v. Merritt Oil Co.</u>, 612 So. 2d 409, 410 (Ala. 1992)). Because Exxon failed to raise the specific arguments it now raises on appeal, this Court need not consider Exxon's assertions concerning the applicability of the collateral-source rule and § 12-21-45 in maritime cases. I therefore concur in the result and take no position on the question of how maritime

law and this Alabama tort-reform statute interact.

#### II. Whether Harrington Nevertheless Opened the Door to the Admission of His Past and Future Medical Expenses Being Covered by His Employer's Workers' Compensation Insurance

Second, Exxon argues that even if the evidence indicating that Harrington's medical expenses had been paid and would be paid in the future by his employers' workers' compensation insurer was inadmissible, Harrington opened the door to the admission of such evidence.

Our Court has explained that "[w]hen one party opens the door to otherwise inadmissible evidence, the doctrine of 'curative admissibility' provides the opposing party with 'the right to <u>rebut</u> such evidence with other illegal evidence.'" <u>Ex parte D.L.H.</u>, 806 So. 2d 1190, 1193 (Ala. 2001) (quoting <u>McElroy's Alabama Evidence</u>, § 14.01, p. 49 (5th ed. 1996)) (emphasis added). However, as the main opinion notes, this doctrine is limited such that "'"the illegal rebuttal evidence may be admitted only to the extent that it <u>cures</u> the effect of the admission of the first illegal evidence."'" <u>Baptist Health Sys., Inc. v. Cantu</u>, 264 So. 3d 41, 46 (Ala. 2018) (quoting <u>Kelley v. State</u>, 405 So. 2d 728, 730 (Ala. Crim. App. 1981), quoting in turn C. Gamble, <u>McElroy's Alabama Evidence</u> § 14.01 (3d ed.

1977)) (emphasis altered).

Courts in other jurisdictions have applied this principle in the workers' compensation context. See, e.g., Johnson v. Weyerhaeuser Co., 134 Wash. 2d 795, 804, 953 P.2d 800, 805 (1998) ("[T]he collateral source rule is designed to protect injured parties. … Injured parties may, however, waive the protections of the collateral source rule by opening the door to evidence of collateral benefits."); Younts v. Baldor Elec. Co., 310 Ark. 86, 89, 832 S.W.2d 832, 834 (1992) ("[A]s a general rule, it is improper for either party to introduce or elicit evidence of the other party's insurance coverage"; however "[w]hen a party testifies about his or her financial condition in a false or misleading manner, … he or she opens the door for the introduction of evidence which might otherwise be inadmissible under the collateral source rule.").

With regard to past medical expenses, the record appears to reflect that both sides complied with the trial court's ruling on Harrington's motion in limine. In short, they each introduced evidence about the actual amount paid without discussing who paid that amount.

However, the problem came when testimony was introduced regarding Harrington's future medical expenses. Specifically, the record

reflects that Harrington's expert witness, Dr. Catherine Brock, testified that she projected Harrington's future medical expenses would be $240,000. Then, when asked on cross-examination whether it is common for the submitted charges by the hospital to be "a lot more than what the hospital actually accepts," Dr. Brock confirmed that it was. Dr. Brock then clarified that such "discounts" are a result of a "negotiated rate" from a "third party." She further testified that her projection of Harrington's future medical expenses "doesn't include" such a negotiated discount because, she said, "there is no way to know the negotiated rate or if a third party would be present to negotiate." (Emphasis added).[4]

---

[4]Specifically, Dr. Brock testified as follows:

"Q. It doesn't include a discount like we saw before?

"A. No. That is not standard methodology in life care planning.

"Q. I understand. You don't do it that way. You do the one charge.

"A. Well, there is no way to know the negotiated rate or if a third party would be present to negotiate.

"....

"... I guess you are asking me to assume there would be a negotiator in this."

During cross-examination, Exxon's counsel attempted to clarify that, assuming there would be a third party negotiating on Harrington's behalf in the future, Harrington would then receive the same discount on his future medical expenses, thus <u>reducing Dr. Brock's projected damages by roughly $100,000</u>:

> "Q: …Assume that my math is right. We would need to do the accepted prices -- If the future is like the past, we would need to turn that -- <u>we would need to discount that $240,000 by forty-one percent</u>. Right?
>
> "A: <u>Assuming that there is a third party to negotiate</u> a third party payer.
>
> "Q: So that would be -- If my math is right <u>that would turn your two-forty number into $141,600.</u> Does that sound about right?
>
> "A: I assume your math is correct. I would have to calculate it.
>
> "Q: Someone will tell me if I mess that up. It is possible. We would need to reduce -- If he only has one revision we would need to do that math, which we can do without you.
>
> "A: Correct."

(Emphasis added.)

On redirect examination, the following exchange occurred between Harrington's counsel and Dr. Brock:

> "Q: [Harrington] is going to have at least some of these

medical services in the future?

"A: Yes.

"Q: <u>The charges are going to be made. He is not a third party vendor</u>?

"A: <u>Correct</u>."

(Emphasis added.)

Following Dr. Brock's testimony, Exxon argued to the trial court that her testimony had opened the door to proof that Harrington's past <u>and</u> future medical expenses had been paid and will continue to be paid by his employer's workers' compensation insurer. In response, however, Harrington's counsel argued that it was <u>Exxon's counsel</u>, rather than Dr. Brock, who had opened the door by asking questions about the discounts to the medical charges.

Although the trial court maintained its ruling excluding evidence indicating that Harrington's medical expenses have been and will be paid by his employer's workers' compensation insurance, it nevertheless reprimanded Harrington's counsel in a manner that, in my view, can only be interpreted as agreeing with Exxon's position:

"The Court: <u>You knew what the Court's ruling was with regard to third party or insurance in the case. I would have assumed you would have gone over that with your expert to</u>

make sure she didn't say anything --

"[Harrington's counsel]: No.

"The Court: -- about an insurance company paying money or being involved in the value.

"[Harrington's counsel]: I wouldn't go over that with her. We never talked --

"The Court: She's your expert. Why wouldn't you?

"[Harrington's counsel]: Because we are not talking about past expenses.

"The Court: You are talking about future expenses. That's what she is called upon to testify.

"[Harrington's counsel]: Her testimony was, in making the calculations I do not assume or take into consideration third parties. She has told me that.

"The Court: It is what it is. They read it from her transcript and I recall her testimony.

"[Harrington's counsel]: I understand. She said that that is not the standards used in preparing a life care plan. There is no way that I would anticipate them being -- I would call it trying to go in the back door to get these bills in and then getting the bills in and saying to her past bills -- well, there is a discount. I couldn't imagine. That may never have crossed my mind.

"The Court: With all due respect these are issues you should have gone over with Ms. Brock before she took the stand. However, I'm denying the motion. The door has not been opened. Do not go into that with [Harrington]."

(Emphasis added.)

### A. Harrington Will Pay His Medical Expenses Until He Exhausts His Tort Recovery

On appeal, Harrington maintains that he did not open the door because Dr. Brock's testimony was accurate. Relying on our Court's decision in Ex parte BE&K Construction Co., 728 So. 2d 621, 624 (Ala. 1998), in which we recognized that that an employer's subrogation rights attach to both past and future medical benefits, Harrington contends that a workers' compensation insurer is entitled to cease all future medical payments until the injured worker has exhausted his or her tort recovery. Harrington also appears to contend that since he will have to pay his future medical expenses himself, he will not receive the benefit of a negotiated workers' compensation rate.

Exxon disputes this statement of the law, arguing that it "was wrong below" and that it "is wrong here." Exxon's reply brief at 25-26. Specifically, Exxon asserts:

"Under Alabama's Worker's Compensation Act, an employer remains responsible for an injured employee's 'reasonably necessary medical and surgical treatment and attention, physical rehabilitation' for the life of the employee. The Act does not forgive the employer's obligation to pay those expenses after a third-party recovery. Rather, it allows (but does not require) employers to seek reimbursement of those

> medical expenses if the employee recovers from another
> source."

Exxon's reply brief at 26 (footnote omitted; emphasis altered).

Under this Court's decision in Ex parte BE&K, supra, Exxon is mistaken that the Alabama Workers' Compensation Act ("the Act"), § 25-5-1, et seq., Ala. Code 1975, "does not forgive the employer's obligation to pay" and that it merely "allows … employers to seek reimbursement." (Emphasis omitted). Among many things, our Court in that case explained that "the Legislature intended that in situations where the injured employee recovers from a third-party tortfeasor, the amount of that recovery attributable to the employee's medical or vocational expenses should be exhausted before the employer or its workers' compensation insurer is obligated to resume payment of those expenses." 728 So. 2d at 624 (emphasis added). Exxon does not refute or otherwise address our decision in Ex parte BE&K.

### B. Rate vs. Payment

While Harrington appears to be correct that he will be paying his future medical bills himself, Exxon's real complaint is that Harrington's expert was wrong to suggest that there was no third party "negotiator" involved so that the rate would be less than the standard billed charges.

37

Although Exxon <u>may</u> have a point, as explained below, the evidence that Exxon contends that it should have been allowed to present in response to this alleged inaccuracy does not "cure" this perceived problem.

The Act makes clear that workers' compensation insurers should direct the medical care of injured employees by selecting the treating physicians to ensure that they charge the statutory rate or an even lower negotiated rate. <u>See, e.g.</u>, § 25-5-77(a), Ala. Code 1975 ("If the employee is dissatisfied with the initial treating physician selected by the employer…, [then] the employee shall be entitled to select a second physician from a panel or list of four physicians selected by the employer."). <u>See</u> <u>also</u> Ala. Admin. Code (Dep't of Labor), r. 480-5-5-.12 ("The employer's authorized treating physician … shall be the physician of record for attending or referral purposes. All referrals shall be pre-approved by the employer/agent."); and <u>Ex parte Smitherman Bros. Trucking, Inc.</u>, 751 So. 2d 1232, 1233 (Ala. 1999) (explaining that "[it is the] employer's right to oversee that treatment so as to ensure not only that the employee receives the proper treatment, but also that that treatment is reasonably necessary and that it is provided in the most efficient and cost-effective manner, without compromising the quality of

38

care").

Because I believe that the employer's right to direct care continues, I believe that the workers' compensation rate should continue even after the injured employee's tort recovery. In fact, the insurer will most likely insist that the treating physicians charge the statutory workers' compensation rates because, absent certain rare circumstances, injured employees are entitled to lifetime medical benefits for their injuries. See United States Steel Corp. v. Baker, 266 Ala. 538, 544-45, 97 So. 2d 899, 905 (1957) (recognizing that "an award of compensation is limited to the injured employee during his lifetime"). In other words, as noted above, the insurer must resume paying medical benefits once the tort recovery is exhausted. See Ex parte BE&K, 728 So. 2d at 624.

Moreover, while the Act requires workers' compensation insurers to pay for an injured workers' legitimate medical expenses, it limits the amount of those payments to the "prevailing rate" or a "maximum schedule of fees" established by statute. § 25-5-77(a) ("[T]he employer … shall pay an amount not to exceed the prevailing rate or maximum schedule of fees as established herein of reasonably necessary medical and surgical treatment and attention …. The total liability of the

employer <u>shall</u>, unless otherwise provided in [the Act], <u>not exceed</u> the prevailing rate or the maximum schedule of fees as established herein."). <u>See</u> <u>also</u> <u>Ex parte BE&K</u>, 728 So. 2d at 623 (recognizing that the Act "applies to future medical benefits that have not been paid, <u>but which the law requires the employer to pay</u>" (emphasis added)).

It necessarily follows that insurers should be able to insist that the statutory caps should apply even when the injured employee is paying during this exhaustion period, otherwise insurers would not receive the benefit of the statutory caps when calculating their subrogation amount and will, thus, eventually have to pay more than they are legally required to pay. In other words, the injured employee's tort recovery would be exhausted quicker given the higher medical charges, thereby requiring the insurer to resume making payments earlier than would otherwise be required.

The problem is how to prove any of this in order to rebut the testimony of Harrington's expert that "there is no way to know the negotiated rate or if a third party would be present to negotiate." The request I see in the transcript from Exxon is to put Harrington on the witness stand and ask him whether "his past [medical expenses were]

paid by a third party" and whether his future medical expenses "<u>will be paid</u> by a third party." (Emphasis added.)[5]

I see no suggestion from Exxon that it wished to question Harrington about statutory workers' compensation rates or about whether he had any personal knowledge about such rates. I also see no suggestion from Exxon that it wished to question Harrington about whether the workers' compensation insurer could (or would) continue to direct care and therefore insist upon the statutory rates for medical care or about whether he had any personal knowledge about that either.

As noted previously, "'"the illegal rebuttal evidence may be admitted <u>only to the extent that it cures the effect</u> of the admission of the first illegal evidence."'" <u>Baptist Health Sys.</u>, 264 So. 3d at 46 (citations omitted; emphasis altered). To help "cure" what it describes as the effect

---

[5]Later, at the end of trial, Exxon also suggested proffering testimony from "Ms. Canada" that Harrington's "past medicals were paid by comp" and that his "future medicals <u>will be paid</u> by comp" and asserting that she "would have testified <u>to those two things</u>." (Emphasis added.) However, I could not locate anything in the trial transcript that provides any clarity as to who "Ms. Canada" was, but I would assume she was an adjuster for the workers' compensation insurer. Regardless, Exxon's only request to the trial court was for her to testify regarding what has been and will be "paid" -- just like the requested testimony from Harrington.

of the testimony given by Dr. Brock, perhaps Exxon might have requested to put a representative of the workers' compensation insurer on the stand to ask about the rate issue and the insurers' future intention to direct medical care or about the legal effects of the statutory rates for workers' compensation care. Or, it might have requested a jury charge dealing with this issue, although I am less certain that an instruction would have been appropriate. Of course, a stipulation about the rate could have solved the issue. And, perhaps there are other solutions to this problem; however, I do not believe that questioning Harrington (or anyone else) about a third party's <u>paying</u> future medical bills addresses the rate issue, and Exxon does not explain how it would address the rate issue.[6]

There is no doubt that harmonizing the collateral-source rule with the doctrine of subrogation of future medical charges is neither obvious nor simple. Although I believe that Harrington's expert was likely incorrect in her explanation of future medical <u>rates</u>, our caselaw is abundantly clear that, in the context of a ruling on a motion for a new trial,

---

[6]And, as noted above, it appears to be inaccurate that future medical expenses "will be paid by a third party" -- at least not until those future medical expenses exhaust the subrogation amount.

"'"'[t]he standard applicable to a review of a trial court's rulings on the admission of evidence is determined by two fundamental principles. The first grants trial judges wide discretion to exclude or to admit evidence.'" Mock v. Allen, 783 So. 2d 828, 835 (Ala. 2000) (quoting Wal-Mart Stores, Inc. v. Thompson, 726 So. 2d 651, 655 (Ala. 1998)) ....

"'"'The second principle "is that a judgment cannot be reversed on appeal for an error [in the improper exclusion of evidence] unless ... it should appear that the error complained of has probably injuriously affected substantial rights of the parties."'" Mock, 783 So. 2d at 835 (quoting Wal-Mart Stores, 726 So. 2d at 655, quoting in turn Atkins v. Lee, 603 So. 2d 937, 941 (Ala. 1992)). See also Ala. R. App. P. 45. "The burden of establishing that an erroneous ruling was prejudicial is on the appellant." Preferred Risk Mut. Ins. Co. v. Ryan, 589 So. 2d 165, 167 (Ala. 1991).'"

Leftwich v. Brewster, 306 So. 3d 26, 33 (Ala. 2020) (quoting Middleton v. Lightfoot, 885 So. 2d 111, 113-14 (Ala. 2003)). Based on the foregoing, Exxon has not shown that the trial court's specific ruling here -- that is, not allowing testimony indicating that Harrington's future medical costs will be "paid" -- has "probably injuriously affected" its substantial rights. I therefore agree that it is not entitled to a new trial and, for this additional reason, concur in the result.

Wise, J., concurs.